UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-11799-RGS

U.S. COMMODITY FUTURES TRADING COMMISSION

v.

JOHN B. WILSON AND JBW CAPITAL LLC

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT

May 16, 2014

STEARNS, J.

The Commodity Futures Trading Commission (CFTC) accuses defendants John B. Wilson and JBW Capital LLC (JBW), of civil violations of the Commodity Exchange Act (CEA). The CFTC alleges that Wilson (and JBW, *see* § 2(a)(1)(B) of the CEA) violated 7 U.S.C. §§ 6m(1), 6b(a)(2)(i)-(iii), 6b(a)(1)(A)-(C),[1] and 6o(1)(A)-(B) by (1) failing to register with the CFTC as a commodity pool operator (CPO) while operating such a pool, (2) knowingly and willfully making misrepresentations of material fact to the pool investor-participants, and (3) using means of interstate commerce to

---

[1] The CFTC Reauthorization Act of 2008 took effect on June 18, 2008; thus, the relevant sections of the CEA with regard to commodities fraud are § 6b(a)(2)(i)-(iii) for acts before June 18, 2008, and § 6b(a)(1)(A)-(C) for acts after June 18, 2008.

defraud and deceive the participants. The CFTC seeks summary judgment, an order of permanent injunction, a permanent trading ban, and a permanent registration ban, against Wilson and JBW. The CFTC also seeks the payment of restitution and civil monetary penalties. Wilson and JBW, for their part, argue that a material dispute over scienter precludes entry of summary judgment.[2]

## BACKGROUND

JBW was registered as a Massachusetts limited liability company on July 23, 2007, and Wilson, a Massachusetts resident, was listed as its sole registered agent. *See* JBW Cert. of Org. (Dkt. #55-6 at 10-11). The JBW Operating Agreement stated that JBW's business purpose was to "invest in stocks, bonds, derivatives, commodity futures, financial futures, stock index futures, options on stocks, and options on futures." *See* JBW Operating

---

[2] Defendants also complain that they have been "unduly restricted" in formulating an opposition because of the CFTC's alleged withholding of discovery. This allegation is baseless. Defendants have engaged in a pattern of abusive discovery practice by demanding the production of massive amounts of irrelevant material. S*ee* Dkt. #38, #51, and #52 (denying defendants' motions to compel). Defendants have also rebuffed the court's repeated invitations to cure their overbroad (or at times incomprehensible) discovery requests. *See, e.g.,* Dkt. #52 (noting that "[d]efendant is free to issue a more targeted 30(b)(6) request in compliance with the rules, but has been on notice of the defects in its first request for more than two months," and that "defendant's motion does not identify what information defendant seeks from the CFTC that it is entitled to under F.R.C.P. 26(b) that it does not already possess.").

Agmt. (Dkt. #55-5) ¶ 5. The Operating Agreement also stated that Wilson was the Manager of JBW and would be compensated for his services, and that, as Manager, he had "sole responsibility" over the investment and management of JBW's assets. *See id.* ¶¶ II(3) & II(6). Neither Wilson nor JBW was ever registered with the CFTC as a CPO, nor did either file a notice with the National Futures Association (NFA) claiming to be exempt from CFTC registration.

In September of 2007, Wilson accepted contributions for JBW from several investors. The initial investors in JBW were family members and acquaintances of Wilson, including Stephen Wilson (Wilson's brother), Peter Parsons, Thomas Trafton, Peter Trafton, and Jeyhsin Yao. In his affidavit in opposition to the CFTC's motion for summary judgment, Wilson refers to these initial investors as the "founders" of JBW. *See* Wilson Aff. (Dkt. #58-4) ¶ 2.

On September 10, 2007, Wilson opened a bank account for JBW at Sovereign Bank, and on September 12, 2007, he opened a trading account for JBW at MF Global, Inc. (MFG). Wilson deposited funds from JBW investors into the JBW bank account and then transferred the pooled funds to the MFG trading account. Wilson used the money to begin trading in

commodity futures in October of 2007, and initially used an algorithm called the "Humphrey Program" to trade commodity futures.[3]

By December 31, 2007, JBW had thirteen pool participants. In March of 2008, JBW accepted funds from at least eight new pool participants. At some point, each of the investors in JBW was sent a "Certificate of Beneficial Interest" (CBI) purporting to show each investor's pro rata percentage share of the pooled funds. During the life of the unregistered pool, Wilson obtained over $2,000,000 from twenty-five pool participants (excluding himself), had total net trading losses of approximately $1,800,000, and returned approximately $227,000 to the investors.

It is undisputed that in operating JBW, Wilson used the telephone and emails. *See* Defs.' Resp. to Stmt. of Facts (Dkt. #59) ¶ 19. Wilson circulated periodic reports to JBW investors, including statements reporting JBW's Net Asset Value (NAV).

**False and Misleading Statements**

Wilson admitted to receiving daily and monthly statements of account from MFG, through which he conducted the trading on behalf of JBW. *See* Wilson Dep. 104:4-10, Sep. 22, 2011 (Dkt. #55-14) (Wilson

---

[3] Wilson has stated that the Humphrey Program was developed by him and an individual named Edward Baafi, and that he had successfully conducted a 90-day simulated trading test of the program on algorithmic futures trading software between December 2006 and May 2007.

9/22/11 Dep.).  Wilson also admitted to sending various emails to the pool participants containing information about the status of the pool, including updated NAV values.  The following chart summarizes the emails sent by Wilson to pool participants prior to September of 2008.[4]

| Date | NAV reported by Wilson | Actual JBW NAV |
|---|---|---|
| As of 11/30/07 | $159,460.00 | $159,460.00 |
| 12/21/07 | $180,071.00 | $177,385.00 |
| 3/01/08 | $566,076.13 | $553,523.00 |
| 5/30/08 | $2,029,271.00 | $1,041,399.00 |

On September 1, 2008, JBW's trading account at MFG reflected a net balance of approximately $2,558,347.  On September 11, 2008, JBW experienced a net trading loss of approximately $1,045,632. Notwithstanding, on September 13, 2008, Wilson reported by email to JBW investors that "Today's NAV" was $2,475,941.  *See* Slowly Decl., Ex. 12 (Dkt. #55-6 at 2).  The actual NAV on September 13, 2008, was approximately $1,149,628.  Wilson admits to circulating this email and it is undisputed that he knew that the $2,475,941 NAV figure was inaccurate.  *See* Wilson Dep. 105:4-10, Nov. 20, 2013 (Dkt. #55-19) (Wilson 11/20/13 Dep.); *cf.* Defs.' Opp'n (Dkt. #58) at 15 (listing a plethora of allegedly disputed facts

---

[4] *See* Pl.'s Mem. (Dkt. #55-1) at 4.  The values in the rightmost column are taken from MFG statements attached as exhibits to the affidavit of Judith M. Slowly, an CFTC Futures Trading Investigator.  *See* Dkt. #55-4, #55-9, & #55-10.

regarding whether Wilson committed "any fraudulent act," but failing to allege that Wilson did not know the actual NAV amount on September 13, 2008). On September 15 and 16, 2008, JBW experienced another net futures trading loss of over one million dollars. *See* Slowly Decl., Ex. 35 (Dkt. #55-7).

On September 22, 2008, Wilson again emailed the JBW pool participants (with the exception of Daniel Mann, a pool participant who had recently agreed to invest), admitting the September 11, 2008 loss, and noting that he had already spoken to each of the email recipients personally. He wrote:

> [I] . . . want to again express my apologies for the remarkable loss I incurred. I also want to apologize for not reporting the $1M loss of 9/11 in my weekly report. ***My intention was not to deceive but to "roll" the loss into the next week and hopefully show some recovery.*** Clearly a recovery was not the case because I experienced the second major loss on the following Monday.
>
> I will be sending a report later this month which will explain how I plan to recover from this. Each of you know this is my profession and only source of income. I will make a recovery and make every effort to make each investor whole.

Slowly Decl., Ex. 13 (Dkt. #64-1) (emphasis added). Wilson acknowledged writing this email. *See* Wilson 9/22/11 Dep. 220:21-222:13.

Prior to sending the September 22, 2008 email admitting the September 11 loss, Wilson welcomed Daniel Mann into JBW, emailing him

on September 17, 2008, to confirm receipt of his $100,000 investment. Slowly Decl., Ex. 57 (Dkt. #55-10 at 6). Wilson admits that this email was sent after the September 11 losses, and that when he received the funds from Mann, he did not disclose the precipitous losses the fund had incurred during the previous few days. *See* Wilson 9/22/11 Dep. 220:4-16. Mann was also omitted from the September 22, 2008 confessional email that Wilson sent to the other pool participants.

At the end of September, Wilson sent an email to each of the investors with a "recovery plan." Wilson pledged to transfer $200,000 of his own funds to the trading account, stated that he would modify his "automated trading program" to contain a "stop loss order" feature, and that he would be soliciting new investor contributions, but that he would segregate the new investor contributions for purposes of his compensation. *See* Wilson 11/20/13 Dep. 112:17-114:11. Wilson admitted that he did not actually modify the program to include a stop-loss order feature, and admitted that he did not actually segregate new funds received (from Mann), contrary to the statements in his recovery plan e-mail. *Id.* 114:12-20.

On December 12, 2008, Wilson emailed an NAV update to Mann, falsely stating that Mann's investment in JBW was worth approximately $120,867, despite the fact that the NAV for the entire pool barely exceeded

$42,000 (Wilson had incurred a net trading loss of approximately $161,875 on December 1, 2008, which he had not disclosed to Mann).

On December 15, 2008, Wilson emailed Mann a CBI, recognizing Mann's initial $100,000 capital contribution (from September). The CBI represented that Mann's percentage interest in JBW as of September 28, 2008, was 3.76% of the total fund. The actual NAV of the JBW fund at the end of September 2008 approximated $10,000.00.[5]

Wilson admitted to knowingly deceiving Mann about his percentage interest in JBW and about the value of the fund in total, and admitted to deceiving him for fear that Mann would withdraw his money and refuse to invest further funds. At his deposition, Wilson testified as follows:

Q: What did you tell him?

A: I told him whatever the $100,000 was over two and a half mill, something like that. I don't know what the percentage was, but it was – I don't know what the percentage was, but it was basically $100,000 of two and a half million.

Q: At the time you told Mr. Mann that he was putting $100,000 or words to that effect into a $2 million fund, that was not true, there was no $2 million fund?

A: You're absolutely right.

Q: Was there a reason why you did not tell him?

A: Fear, simple as that.

Q: Was there a concern that he would not invest the money?

_____

[5] Dkt. #55-1, at 6. On or about December 16, 2008, Mann invested another $100,000 in JBW. *Id.*

A: Yes.

Wilson 9/22/11 Dep. 147:19-148:12.  Wilson explained that he misled Mann in the attempt to recoup the losses suffered by his other investors in September of 2008.  *See id.* at 148:13-24.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).  The nonmoving party "must adduce specific, provable facts demonstrating that there is a triable issue." *Id.*, quoting *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir. 1989).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphases in original).

"State of mind" issues do not necessarily preclude summary judgment. *See Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."); *Carmona v. Toledo*, 215 F.3d 124, 133 (1st Cir. 2000) (a moving party is not required to "prove a negative" to avoid trial on a specious claim).

## The Commodities Exchange Act

Section 1a(11) of the CEA defines "Commodity pool operator" (CPO) as "any person– (i) engaged in a business that is of the nature of a commodity pool . . . or similar form of enterprise and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property . . . for the purpose of trading in commodity interests, including any– (I) commodity for future delivery." 7 U.S.C. § 1a(11). A commodity pool is "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." *Id.* § 1a(10)(A).

## CPO Registration Requirement

It is unlawful for a CPO "to make use of the mails or any means or instrumentality of interstate commerce in connection with his business" unless the CPO registers with the CFTC (with certain exceptions). *Id.* § 6m(1).[6] Principals are liable for the violations of their agents in this regard. *See* 7 U.S.C. § 2(a)(1)(B), and 17 C.F.R. § 1.2. If a person claims exemption from the requirement under one of the articulated exceptions, he or she must still file an electronic notice with the NFA. 17 C.F.R. § 4.13(b)(1). It is beyond dispute that neither Wilson nor JBW registered as a CPO, nor did either file an electronic notice of a claimed exemption with the NFA.[7]

In opposition to the CFTC's motion for summary judgment, Wilson alleges that "[t]he undisputed evidence proves that Mr. Wilson was not solely responsible for decisions and that the decision-making of the Founders [of JBW] was on a collective basis." Defs.' Opp'n at 4.[8] This

---

[6] The exceptions are set out in 17 C.F.R. § 4.13.

[7] In any event, Wilson did not qualify for exemption from the registration requirement because JBW had more than 15 pool participants, controlled more than $2 million in capital contributions, and because Wilson was compensated for his services as the manager of JBW. Dkt. #55-1 at 10.

[8] In support, Wilson cites page 37, line 9-19 of an October 2, 2013 Hearing Transcript, which is a portion of his deposition testimony on direct examination, answering questions asked by his lawyer, Philip Giordano. As

assertion (even assuming that it had some legal relevance) is directly contracted by Wilson's own testimony:

> Q: You then ultimately opened up a futures trading account at Man Financial?
>
> A: That's right, MF Global.
>
> Q: In the name of JBW Capital?
>
> A: That is correct.
>
> Q: Not in your name?
>
> A: That's right.
>
> Q: But you are the one who had trading authority over the JBW account at MF Global?
>
> A: That's correct.
>
> Q: No one else?
>
> A: That's correct.

Wilson 9/22/11 Dep. 77:4-16.

> Q: Were you the only person that had check signing authority on the JBW account at Sovereign Bank?
>
> A: Yes.
>
> Q: Why did you choose MF Global for the clearing firm?
>
> A: They gave the best commission rate of any firm.

*Id.* at 89:15-22. Further, Wilson admitted that he controlled the JBW account and made all financial decisions affecting the pool:

---

the entirety of the cited testimony concerns interactions between Wilson and others "before JBW Capital was created" (*see* line 11), the testimony is irrelevant to any issue in this case.

Q: Now, I know you mentioned that you considered them equal members because they have certificates of beneficial interest, but they didn't have managing decision power over the company?

A: That's correct.

Q: They didn't have trading authority over the account?

A: That's correct.

Q: They didn't have the check signing authority over the bank account?

A: That's correct.

Q: Even though they had a beneficial interest in the company as an investor, all the executive decisions were still being made by you for the company?

A: That is correct.

Q: And only you?

A. That is correct.

*Id.* 107:10–108:4.

Wilson's second line of defense would excuse his (and JBW's) failure to register, because he supposedly relied on "professionals" for legal, tax, accounting, regulatory and compliance matters. *See* Defs.' Opp'n at 4.[9] Specifically, Wilson asserts that an attorney named James DeMaria "was engaged to make sure that the entity was in accord with all compliance

---

[9] The individuals Wilson names as his "professionals" are Peter Kortkamp, Esq. (as legal counsel), James DeMaria, Esq. (as legal counsel), Lillian Gonzales (a CPA), and Kate Ryan (a CPA). Kortkamp, DeMaria, and Gonzales were all investors in JBW Capital. Ryan was an employee at Gonzales' accounting firm (Gonzales and Associates).

regulatory registration issues" and that he and the other professionals "had a duty to correctly advise the Defendants . . . of all relevant issues pertaining to their field of expertise, including but not limited to the obligation, if any, to register the securities of JBW, whether JBW and/or Mr. Wilson had a duty to register as an investment advisor, or otherwise." Defs.' Opp'n at 5.

Wilson also points to a February 24, 2008 email he sent to Kate Ryan, a CPA, in which he stated:

> Hi Kate,
>
> I'm attracting more investors which is good news. What I don't want is bad news about registration concerns. I attached this hyperlink about "investment clubs" which seems to best apply to my L.L.C. If I understand it correctly my "gates" to avoid SEC or other regulation is 100 members or $25M. Am I right?
>
> [hyperlink]
>
> As we discussed many times, I want to be a quiet successful venture; I don't want publicity, notoriety or constriction. I want to make a lot of money for me and my investors and I want to play by the rules. That being said, I want to protect my back side and thank you for your help.
>
> John

Slowly Decl., Ex. 10 (Dkt. #55-6). Immediately beneath the first paragraph of the email, a handwritten "Yes" appears. (Lillian Gonzales testified that

the handwriting appears to be that of Ryan, then no longer her employee).

*See* Defs.' Opp'n, Ex. 13 (Sep. 30, 2013 Hrg. Trans.), 185:1-10.[10]

Putting aside the fact that this email correspondence is dated well after Wilson began operating JBW, and passing over the contradictory nature of Wilson's own testimony,[11] to the extent that this argument might be construed as an attempted "misled by counsel" or "misled by CPA" defense, it vastly understates the elements of a proper "advice of counsel" defense and the obligations incumbent upon a party asserting it. *See, e.g.,* *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 275 (1991) ("To establish the advice-of-counsel defense, the party raising it must show that: (1) he is acting in good faith in the belief that he has a good cause for his action and is not seeking an opinion to shelter himself; (2) he has made a full and honest disclosure of all the material facts within his knowledge or belief; (3) he is doubtful of his legal rights; (4) he has reason to know that

---

[10] Ryan by way of affidavit avers that "Wilson never asked me whether JBW should be registered with [the CFTC] or [the NFA]. I assumed that Wilson had an attorney for questions regarding any need for registration as my focus was on preparing the tax returns for JBW. I do not have any knowledge or expertise about the registration rules of the CFTC or NFA." Slowly Aff., Ex. 52 ¶ 5.

[11] In his September 22, 2011 deposition, Wilson was asked "you were not registered with the NFA or the CFTC?" He responded, "I was not," and was then asked "Did you ever consider registering with the NFA?" and "You didn't consult with anybody about whether or not you should register?" He responded "I did not" to both questions. Wilson 9/22/11 Dep. 92:9-19.

his counsel is competent; (5) he honestly complied with his counsel's advice; and (6) his counsel is of such training and experience that he is able to exercise prudent judgment in such matters.").

In any event, the registration requirement does not contain a "state of mind" limitation to liability. There is a "flat prohibition . . . against using the facilities of interstate commerce to give commodity advice unless registered," and "[w]hile fraud and misconduct may also be violations of the Act . . . violations of § 6m alone are sufficient" to warrant the granting of an injunction. *CFTC v. British Am. Commodity Options*, 560 F.2d 135, 142 (2d Cir. 1977). The *British American* Court also noted that "Congress has specifically found that the activities of commodity trading advisors affect substantially the transactions on commodity markets, *see* 7 U.S.C. § 6l, and it has made the policy decision that the conduct of business by unregistered advisors is not in the public interest." *Id.*

Although the court is unaware of any case directly discussing state of mind with regard to a *failure* to register (as opposed to operating as a CPO when the CFTC has *rejected* an application for registration), the CFTC makes a compelling analogy to the securities laws generally and to the flat prohibition against holding oneself out as an investment advisor without first registering with the Securities and Exchange Commission (SEC). 15

U.S.C. § 80b-3. Courts have consistently held that the SEC registration requirement is a "strict liability" provision. *See, e.g., SEC v. Blavin*, 557 F. Supp. 1304, 1309 (E.D. Mich. 1983), *aff'd*, 760 F.2d 706, 712 (6th Cir. 1985).

I agree with the CFTC that for enforcement purposes, § 6m(l) of the CEA deserves to stand on the same footing as Securities Exchange Act (SEA) § 80b-3. As in the case of the SEA, the CFTC registration requirement is "central" to the "comprehensive scheme for regulation of trading in commodity futures" established by Congress in the wake of severe abuses of the commodity future market. *See British Am.*, 560 F.2d at 138 ("Registration is the kingpin in this statutory machinery, giving the Commission the information about participants in commodity trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the Act.").

In the context of strict liability, there is little force to Wilson's lack of scienter argument given his direct admission that that he "chose" not to register as a commodity pool operator.[12]

---

[12] Scienter is "a mental state embracing the intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-194 n.12 (1976). It may also be established by a showing of "a high degree of recklessness." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002).

Q:  It was your intent when you started JBW capital to use the investors' money to only trade futures?

A:  Right.

Q:  That was your intent?

A:  That's right.

Q:  That's what you told the investors?

A:  That's right.

Q:  That's what you did, you only traded futures with their money?

A:  That is correct.

Q:  Given that, sitting here today, why do you still think it was not a commodity pool?

A:  I just didn't think of it as a commodity pool because I had not registered with the NFA nor the CFTC, which would have then designated it as a commodity pool.

Q:  I am asking you your opinion based upon your experience, because you have some experience in the futures market, why do you not think that you should have been registered as a commodity pool operator?

A:  I'm not saying that I didn't think I should. I chose not to register as a commodity pool operator.

Wilson 9/22/11 Dep. 94:20–95:22.  The court therefore concludes that

Wilson, and by extension, JBW, violated 7 U.S.C. § 6m(1) by failing to

register as a CPO as required.


**Commodities Fraud**

The CEA contains a general fraud provision, stating:

It shall be unlawful—

**(1)** for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .

**(A)** to cheat or defraud or attempt to cheat or defraud the other person;

**(B)** willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

**(C)** willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

7 U.S.C. § 6b(1)(A)-(C).[13]

"In an enforcement proceeding, the CFTC can show a violation of this anti-fraud provision by establishing that the defendant intended to make and did make a material misrepresentation with scienter." *S.E.C. v. Princeton Econ. Int'l Ltd.*, 73 F. Supp. 2d 420, 424 (S.D.N.Y. 1999) (collecting cases); *see also TC v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir. 2002) (noting that to establish a violation of section 6(b)(1)(A)-(C), the CFTC must prove that (1) a misrepresentation was made, (2) with scienter, and (3) that the misrepresentation was material).

---

[13] 7 U.S.C. § 6b(a)(2)(i)-(iii) for acts prior to June 18, 2008.

A statement is "material" if there is a "substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105 (2d Cir. 1986) (citing *TSC Indus. Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). Fraudulent statements about NAV are material. *Princeton Econ.,* 73 F. Supp. 2d at 423 (letters to investors overstating the NAV were material misrepresentations in connection with sales of securities); *Bruhl v. Price Waterhousecoopers Int'l,* 257 F.R.D. 684, 697 (S.D. Fla. 2008) ("[T]he fact that some investors would have access to different data[] does not eliminate the NAV statements as a relevant and material matter to be considered in the investment calculus.").

Wilson's sole defense to the obviously false (and material) statements about NAV that he made to his investors is the rather dubious contention that he didn't "intend" to defraud anyone. However, as the First Circuit has noted, "the Commission need not find an actual intent to misrepresent a fact or to deceive." *First Commodity Corp. of Boston v. CFTC*, 676 F.2d 1, 6 (1st Cir. 1982). Rather, "the Commission has the power to base liability upon "willful" behavior, liberally defined to include 'reckless' behavior." *Id.* at 7. Recklessness in a securities context is typified by "an extreme departure from the standards of ordinary care, and which

presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999). A misrepresentation can be so bald (*e.g.*, "Today's NAV for JBW is $2,475,941," when it is in fact $1,149,628) that it makes it "very difficult to believe the speaker was not aware of what he was doing." *First Commodity Corp. of Boston*, 676 F.2d at 6-7. Here, however, the court need not even consider "recklessness," as Wilson has not denied knowing that his statements were false. His excuse that he did not "mean" to deceive, but just "meant" to roll-over the losses into the next week or month's report in the Micawber-like hope that something would turn up, virtually defines an "intent to deceive."[14]

Lastly, Wilson argues that none of his investors relied on his misrepresentations. However, in public enforcement cases, reliance is not an essential element. *See, e.g., JCC, Inc. v. CFTC,* 63 F.3d 1557, 1565 n.23 (11th Cir. 1995). The CEA "makes it actionable 'to cheat or defraud or *attempt to cheat or defraud* such other person,'" and thus it is

---

[14] Wilson also made separate misrepresentations and material omissions in his emails to Mann, even after he disclosed the September 11, 2008 losses to his other investors. Actionable misrepresentations include those made to persons during the solicitation of funds. *Saxe v. E.G. Hutton & Co., Inc.,* 789 F.2d 105, 110-111 (2d Cir. 1986); *Hirk v. Agri-Research Council Inc.*, 561 F.2d 96, 103-104 (7th Cir. 1977); *CFTC v. Rosenberg,* 85 F. Supp. 2d 424, 447-448 (D.N.J. 2000).

"unnecessary to show reliance even in a private action" because "an attempt that fails (perhaps because no one relied on it) is nonetheless a violation of [7 U.S.C. § 6b]." *Slusser v. CFTC,* 210 F.3d 783, 786 (7th Cir. 2000) (emphasis added in original).

## CPO Commodities Fraud

Section 6o of the CEA is a "parallel statute" to section 6b (the general anti-fraud provision discussed above), "forbidding fraud and misrepresentation by commodity trading advisors." *Stotler & Co. v. CFTC,* 855 F.2d 1288, 1291 (7th Cir. 1988); *see also CFTC v. Driver*, 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012) ("The same intentional or reckless misappropriations, misrepresentations, and omissions of material fact violative of section [6]b of the Act . . . also violate section [6]o(1)(A)-(B) of the Act."). Section 6o(1)(A) of the CEA makes it unlawful for a CPO to use instruments of interstate commerce to "employ any device, scheme, or artifice" to defraud prospective or actual customers. *Id.* Section 6o(1)(B) makes it unlawful to use the instruments of interstate commerce to "engage in any transaction, practice, or course of business which operates as a fraud or deceit" upon actual or prospective customers. *Id.*

As noted in the discussion of section 6b, it is undisputed that Wilson sent false NAV updates, among other false and misleading financial

information, to the JBW pool participants.  It is also undisputed that he used means of interstate commerce to do so (email), and did so while acting as a CPO.  This is enough to find that Wilson violated section 6o(1)(B), which, unlike section 6b, has no scienter requirement.  *See First Commodity Corp.,* 676 F.2d at 6 (noting that section 6o is an "antifraud provision that does not depend on scienter"); *In re Kolter*, Comm. Fut. L. Rep. ¶ 26,262, 1994 WL 621595 at *7 (CFTC Nov. 8, 1994) ("Although scienter must be proved to establish a violation of section [6]b and section [6]o(1)(A), it is not necessary to establish a violation of section [6]o(1)(B).").  Further, given that sections 6o and 6b are viewed as parallel provisions, differing only in that section 6o requires a CPO to have engaged in the violative conduct, and to have used means of interstate commerce to do so, there is no reason to re-evaluate the scienter requirement with respect to section 6o(1)(A). Wilson's allegations of a dispute of fact regarding scienter are thoroughly refuted by his own admissions and by the documentary evidence, as discussed earlier in this opinion.  Thus, the court finds that Wilson also violated 7 U.S.C. § 6o(1)(A).

**Requested Relief**

Injunctive Relief: Pursuant to 7 U.S.C. § 13a-1, the CFTC may "bring an action in the proper district court of the United States" and may seek to

enjoin "any act or practice constituting a violation of any provision [of the CEA] or any rule, regulation, or order thereunder." 7 U.S.C. § 13a-1(a). The injunctive relief the CFTC seeks is appropriate, given Wilson's violations. Further, Wilson recognizes that he has an "addiction" to trading and that, as a result, he has "exited the industry, as far as being a trader." *See* Wilson Dep. 56:10-23, Oct. 18, 2011 (Dkt. #55-15); *see also id.* at 78:10-22.

Civil Penalties: Pursuant to 7 U.S.C. § 13a-1(d)(1), and 17 C.F.R. § 143.8, civil monetary penalties are permitted up to the greater of $130,000 per violation for acts committed prior to October 23, 2008, or treble a defendant's monetary gain. Civil monetary penalties may be imposed in an amount that is appropriate to the gravity of the offense and as is necessary as a deterrence. "Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost." *In re GNP Commodities, Inc.*, Comm. Fut. L. Rep. ¶ 25,360 at 39,222, 1992 WL 201158, at *23 (CFTC Aug. 11, 1992).

Civil penalties are appropriate here. Wilson and JBW violated core provisions of the CEA. Further, Wilson continues to refuse to acknowledge the gravity of his actions, and continues to mischaracterize what can only be called "lies" to his investors about the *current* value of their investments, by calling them "estimates," or, alternatively, by stating that he was

genuinely optimistic about the fact that the value of the fund would someday equal the figure he told his investors was then "current." *See, e.g.,* Wilson 11/20/13 Dep. 100:13-22, 102:7.[15]  In the absence of a showing by the CFTC of any personal gain on Wilson's part as the result of the fraud, the appropriate measure of a civil penalty is the statutory per-violation amount, rather than a trebling of the investors' losses (as the CFTC proposes).[16]

---

[15]  When Wilson was asked why he sent an email on May 30, 2008, stating that "Today's NAV" is $2,029,271.45 when in fact the NAV on that date as reflected in an MFG statement, was actually $1 million less, he replied, "I did it because I had an estimate of what was going to happen in the month of June.  And that seems to have realized itself, by looking at the June statement." *Id.* 102:7-24.

[16]  The CFTC has also requested disgorgement and restitution in the amount of $1,780,456, which is the agency's calculation of loss to the pool participants (who had invested a total of $2,008,275, and received approximately $227,818 when Wilson dissolved the fund).  While the court's jurisdiction under section 13a-1 includes equitable remedies such as disgorgement and restitution, *see, e.g., CFTC v. Wilshire Inv. Mgmt. Corp.,* 531 F.3d 1339, 1344 (11th Cir. 2008) (collecting cases),  the appropriate measure for restitution here is "the benefit unjustly received by the defendants."  *F.T.C. v. Verity Int 'l, Ltd.,* 443 F.3d 48, 67 (2d Cir. 2006) (noting that the district court "strayed off course" when measuring restitution purely by the plaintiffs' losses); *see also CFTC v. Am. Metals Exchange Corp.,* 991 F.2d 71, 78 (3d Cir. 1993) ("[I]n designing remedies under the [CEA] or the [SEA], the courts have considered disgorgement to serve primarily to prevent unjust enrichment.").  There must be a "relationship between the amount of disgorgement and the amount of ill-gotten gain." *Id.* at 79.  Wilson and JBW committed significant violations of the CEA, and thus the court has imposed civil penalties, but no evidence

## ORDER

For the foregoing reasons, the CFTC's motion for summary judgment is <u>ALLOWED</u>.  The CFTC will have ten (10) days from the date of today's Order to submit a proposed form of final judgment consistent with the court's findings and rulings.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

has been presented with regard to the amount of retained profits or ill-gotten gains.  The court therefore declines to enter an order of restitution.