# United States Court of Appeals
## For the First Circuit

———————————

Nos. 14-2173
     14-2224

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff, Appellee/Cross-Appellant,

v.

JBW CAPITAL, LLC; JOHN B. WILSON,

Defendants, Appellants/Cross-Appellees.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

———————————

Before

Torruella, Lynch, and Barron,
Circuit Judges.

———————————

Philip M. Giordano, with whom Siobhan M. Tolan, Giordano &
Company, P.C., and Reed & Giordano, P.A. were on brief, for
appellants.
     Ajay B. Sutaria, Counsel, Commodity Futures Trading
Commission, with whom Jonathan L. Marcus, General Counsel, and
Robert A. Schwartz, Deputy General Counsel, were on brief, for
appellee.

———————————

January 29, 2016

———————————

LYNCH, **Circuit Judge**.   In this commodity trading fraud case brought by the Commodity Futures Trading Commission ("CFTC" or "Commission") against John B. Wilson and JBW Capital LLC ("JBW"), the Massachusetts federal district court granted on summary judgment the CFTC's request for a finding of liability, and imposed injunctive relief and civil penalties.   It declined to award restitution, as measured by loss to pool participants.   As a result, both sides have appealed.

Specifically, Wilson and JBW contest the district court's conclusion that they are liable under the Commodity Exchange Act ("CEA") for failing to register with the CFTC, in violation of 7 U.S.C. § 6m(1), and for violating two commodity fraud provisions, §§ 7 U.S.C. 6b(a)(1) and 6o(1).   They claim that there are disputed issues of material fact, that the district court erred as a matter of law in its analysis of scienter under 7 U.S.C. § 6o(1)(A) and (B), and that the district court was required to give them an evidentiary hearing with regard to remedies and civil penalties.   The CFTC cross-appeals, arguing that the district court erred in its decision not to award restitution.   We affirm.

I.

On review of an order granting summary judgment, we recite the facts "in the light most favorable to the nonmoving party." Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc., 804 F.3d 127, 129 (1st Cir. 2015).   Here, in violation of

the Federal Rules of Appellate Procedure, Wilson and JBW[1] have provided no recitation of the facts with citations to the record, instead devoting almost their entire brief to simply asserting there are many issues of fact in their argument section.[2] Nonetheless, we have tried to recite the facts from the record in the light most favorable to Wilson.

On July 23, 2007, JBW (which stands for "John B. Wilson") was registered as a Massachusetts limited liability company. JBW's Operating Agreement stated that its "specific business purposes and activities contemplated by the founders of this LLC" included to "invest in stocks, bonds, derivatives, commodity futures, financial futures, stock index futures, options on stocks, and options on futures."

Wilson was listed as the only registered agent in the Operating Agreement and the Certificate of Organization, and in an affidavit, Wilson said that he was the "manager and sole

---

[1] Collectively, Wilson and JBW will be referred to as "Wilson" unless specified otherwise. JBW is vicariously liable for Wilson's "act[s], omission[s], or failure[s]." 7 U.S.C. § 2(a)(1)(B). See Stotler & Co. v. CFTC, 855 F.2d 1288, 1292 (7th Cir. 1988).

[2] Federal Rule of Appellate Procedure 28(a)(6) requires "a concise statement of the case setting out the facts relevant to the issues submitted for review . . . with appropriate references to the record." Wilson also violated Federal Rule of Appellate Procedure 28(e) throughout his brief by not citing to pages of the appendix for "[r]eferences to the parts of the record contained in the appendix."

administrator" of JBW.  Wilson was also listed as the only manager in the Operating Agreement, which said that except as otherwise specified or provided under state law, "all management decisions relating to the LLC's business shall be made by and be the sole responsibility of the Manager."  Wilson testified[3] that he was the only person with trading authority over JBW's account.

In September 2007, Wilson did not register as a commodity pool operator ("CPO") with the CFTC, nor did he file a notice with the National Futures Association ("NFA") stating he was exempt from registration.  Before his tenure with JBW, Wilson had been registered with the NFA from about 2005 to 2006 as an associated person of Tradex Group LLC.  He also previously had a personal commodity futures account, which Wilson testified was not profitable.

In September 2007, Wilson's brother and a number of acquaintances invested in JBW.  Wilson referred to these investors as "founders."  Their investments were used to create a fund, and JBW began trading in October 2007, in part using an algorithm called the "Humphrey Program."  By January 2008, JBW had thirteen investors and approximately $369,890 in contributions.  According

---

[3]    Wilson became subject to various investigations by different government entities.  He testified in CFTC depositions, a state "on the record interview," and state administrative hearings.  The record in federal court contains depositions and examinations from various proceedings at which Wilson testified.

to a CFTC Division of Enforcement investigator, JBW's bank records showed that between 2007 and 2008, at least twenty-five investors deposited about $2 million in JBW's bank account.

Wilson testified that he did not tell his investors that he "had limited experience trading on commodities," though he agreed that he "had limited experience." There was no requirement that the investors have trading experience, and as far as Wilson was aware, the investors, other than his brother, had "no experience in futures trading." He said that he told some, but not all, of the investors about the risks involved with commodity futures trading, and there was no document of any kind given to investors describing the risks of engaging in commodity futures trading.

JBW began trading in October 2007 and stopped trading in September 2009, and its account at MF Global, Inc., a commodity broker, was closed in May 2010. Wilson lost almost $1.8 million in trades and returned about $227,000 to investors.

Wilson e-mailed investors with JBW's Net Asset Value ("NAV") on a weekly, biweekly, or quarterly basis. On at least four instances, Wilson's e-mails overstated JBW's value. First, a December 1, 2007, e-mail stated that as of November 30, 2007, "Today's NAV" was $159,460.95, while JBW's November 30, 2007, bank statement listed its "Account Value at Market" as $147,281.51. Second, a December 21, 2007, e-mail stated that as of December 21,

- 5 -

"Today's NAV" was $180,071.71, while JBW's December 31, 2007, bank statement listed its account value at market as $177,385.40.[4] Third, a March 1, 2008, e-mail said that "Today's NAV" was $566,076.07, while JBW's February 29, 2008, bank statement listed its account value at market as $553,523.54.  Fourth, a May 30, 2008, e-mail said that "Today's NAV" was $2,029,271.45, while JBW's May 30, 2008, bank statement listed its account value at market as $1,041,399.80.

As to this last egregious overstatement, Wilson said that the amount provided as "Today's NAV" in the May 30, 2008, e-mail was an "estimate," but he acknowledged that the word "estimate" did not appear anywhere in the e-mail.

A series of e-mails in September 2008 misrepresented JBW's value and then tried to explain the misrepresentation.  On September 13, 2008, Wilson e-mailed investors that "Today's NAV" was $2,475,941.00.  However, the e-mail did not include that two days earlier -- on September 11, 2008 -- JBW had lost $1,045,632.91.  JBW's account value at market on September 13, 2008, was actually about $1,149,628.82.[5]  On September 22, 2008,

---

[4]    That account statement reflects that JBW did not complete any trades from December 21, 2007, through the end of the month.

[5]    This was the account value at market on Friday, September 12, 2008.  Wilson testified that he did not remember from where he got the $2,475,941 number he gave to investors as "Today's NAV."

Wilson e-mailed investors apologizing for not informing them about the $1 million loss on September 11, stating "I . . . want to apologize for not reporting the $1M loss of 9/11 in my weekly report." Wilson wrote that his "intention was not to deceive but to 'roll' the loss into the next week and hopefully show some recovery." He continued, "[c]learly, a recovery was not the case because I experienced the second major loss on the following Monday." Specifically, on September 15, 2008, JBW lost $990,390.00. In his September 22, 2008, e-mail, Wilson said that he would send a report later in the month "explain[ing] how [he] plan[s] to recover from this." A September 2008 trading statement listed JBW's account value at market and balance at the end of the month as $10,943.34.

On September 30, 2008, Wilson sent investors an e-mail with the subject "Recovery Plan." It stated that Wilson would transfer $200,000 of his "personal funds to the trading account for the beneficial interest of each investor of record on 9/6/08 (the 'high water mark'). As a result, each investor will recoup approximately 9% of their loss on day one." The e-mail included that "[t]he automated trading program will be modified with a 'stop loss order' feature to avoid accumulation of losing positions (which got us in trouble in the first place)." Wilson also said that he would segregate contributions from new investors.

Wilson did transfer $200,000 of his personal funds to JBW, but he "did not have the time to" modify the trading program to include a "stop loss order," nor did he segregate the funds from new investors.

On September 15, 2008, a new pool participant, Daniel Mann, invested $100,000 in JBW.[6] When Wilson initially spoke to Mann about the fund in May or June of 2008, the fund was showing a strong performance. In September, Wilson told Mann over the phone that JBW had taken a loss, but he "did not specify what the loss was" -- which, by September 15, was about $2 million. Wilson said that he felt "a moral obligation to tell [Mann] there had been a loss," but he "told him nothing other than it was a loss. [Mann] didn't inquire further," and agreed to invest his money with Wilson "regardless." When Mann made his investment, Wilson said to him that the fund was worth about $2 million, which Wilson knew was inaccurate, but Wilson was afraid that otherwise Mann would not invest the money.[7] Wilson also did not include Mann on the September 22 e-mail to investors that informed them of the losses suffered in mid-September. On September 26, 2008, Wilson

---

[6]     The check for $100,000 was dated September 15, 2008. Wilson sent an e-mail to Mann on September 17 acknowledging receipt of the check and saying that he would "be depositing the funds in the next few days."

[7]     JBW's September 15, 2008, "daily commodity statement" listed its account value at market as $227,550.94.

sent an e-mail to Mann, saying that Wilson would "monitor [Mann's] $100K investment in such a way that if any time the equity fall[s] 10% [Wilson] will insure all funds are in cash, and will contact [Mann] for further direction."

JBW suffered further losses after Mann's investment. On December 12, 2008, Wilson e-mailed Mann telling him that the NAV of Mann's investment on that day was $120,867.40. JBW's balance at the end of that day was approximately $42,409. Three days later, on December 15, 2008, Wilson e-mailed Mann a "Certificate of Beneficial Interest" dated September 28, 2008. The Certificate said that Mann's $100,000 constituted a 3.76% beneficial interest in JBW.[8] On September 28, 2008, around $10,000 was in the fund. Wilson testified that he had "calculated [Mann's] $100,000 as a percentage of the high watermark of the fund," which was about $2.5 million. He testified that he calculated it this way because it was his "intent all along . . . to recover the entire fund back to . . . the 2.3 or $4 million that [he] consider[ed] the high watermark with [his] own contribution of $200,000 trading separately and contributing into the fund." He said "[i]t was a grievous error on [his] part showing the power of [his] addiction."

---

[8]     If Mann's $100,000 contribution constituted a 3.76% in JBW, then JBW's value as of September 28, 2008, would have been about $2,659,574.

In December 2008, JBW lost $92,154.45, leaving its balance and account value at market at $120,867.40.

Mann made a second investment of $100,000 around December 16, 2008. Wilson testified that before placing Mann's second investment in the fund, he had told Mann that JBW had suffered further losses since the first investment but that he had made up the losses. However, Wilson also testified that he did not disclose that JBW had lost more than $2 million in September 2008 and that he did not recall telling Mann that the Certificate of Beneficial Interest he had sent on December 15, 2008, was inaccurate. On February 2, 2009, Wilson e-mailed Mann that Mann's balance was $224,812.23 on January 31, 2009. JBW's bank account statement from January 30, 2009, listed its balance at $278,079.61, and its account value at market at $198,767.19.[9] On February 25, 2009, Mann sent an e-mail to Wilson stating that "of course, [he] want[s] the same downside limit of 10% loss on the 2nd 100,000 that [he] had on the original 100,000." Wilson testified that he did not honor the ten percent stop-loss provision, and Mann's investment was ultimately lost.

---

[9]     At one point in the record, there is an interview where Wilson suggests Mann's money could be in a sub-account. He says, "I'm not -- I'm not positive, but I know -- I may -- I may have moved the money from the sub account up to the master account, I can't remember." Wilson makes no mention of this in his briefs, and, in any event, it does not affect our analysis.

II.

On September 28, 2012, the CFTC filed a complaint against Wilson and JBW in the federal district court of Massachusetts, alleging violations of 7 U.S.C. § 6m(1) (CEA § 4m(1)); 7 U.S.C. § 6b(a)(1)(A)-(C) (CEA § 4b(a)(1)(A)-(C)); and 7 U.S.C. § 6o(1)(A)-(B) (CEA § 4o(1)(A)-(B)).[10]  The CFTC moved for summary judgment on February 27, 2014, requesting a permanent injunction, restitution, and civil monetary penalties.  The district court granted the CFTC's motion for summary judgment in an order dated May 16, 2014.  CFTC v. Wilson, 19 F. Supp. 3d 352, 364 (D. Mass. 2014).  It granted the CFTC's requests for injunctive relief and civil penalties and determined that "[i]n the absence of a showing by the CFTC of any personal gain on Wilson's part as the result of the fraud, the appropriate measure of a civil penalty is the statutory per-violation amount, rather than a trebling of the investors' losses (as the CFTC proposes)."  Id.

On May 27, 2014, the CFTC filed a motion for partial reconsideration with respect to restitution, in which it contended that "under the circumstances of this case as well as First Circuit precedent, restitution should be calculated by reference to the customers' losses."  The district court denied the motion in an

---

[10]     The Enforcement Section of the Massachusetts Securities Division had filed an administrative complaint against Wilson in 2011 for violations of chapter 110A of the Massachusetts General Laws, the Massachusetts Uniform Securities Act.

order dated July 17, 2014.  CFTC v. Wilson, 19 F. Supp. 3d 352, 365-66 (D. Mass. 2014).  It found that "[t]he additional cases cited by the CFTC neither compel an order of restitution as a matter of law, nor are the facts of those . . . cases analogous to those in this case," id. at 365-66, and concluded that its disagreement with the CFTC was a "difference of opinion," id. at 366.  On October 5, 2014, the district court issued a final judgment for a permanent injunction and a civil monetary penalty in the amount of $2,860,000.  This appeal and cross-appeal followed.

III.

"We review orders for summary judgment de novo, assessing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." Packgen v. BP Expl., Inc., 754 F.3d 61, 66 (1st Cir. 2014) (quoting Barclays Bank PLC v. Poynter, 710 F.3d 16, 19 (1st Cir. 2013)). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(a)).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A.    Failure to Register as a CPO

Under 7 U.S.C. § 6m(1), with certain exceptions, "[i]t shall be unlawful for any commodity trading advisor or commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor or commodity pool operator."  7 U.S.C. § 6m(1).  Those claiming to be exempt from this requirement must file an electronic notice with the NFA.  17 C.F.R. § 4.13(b)(1).  Wilson did not register as a CPO, nor did he file a notice of exemption with the NFA.  Wilson agrees that "[i]t is undisputed that JBW Capital was a commodity pool,"[11] and that he did not register as a CPO with the CFTC or NFA.  He also does not claim he qualifies under any exception to registration.

Instead, Wilson contends that there were disputed facts as to his reliance on and engagement of "several professionals," and that "[t]he record below demonstrates that [he] sought out,

---

[11]    As "manager and sole administrator" of this pool, Wilson, who received funds for the purpose of trading commodity futures, was a commodity pool operator.  See 7 U.S.C. 1a(11)(A)(i).  Wilson was listed as the only registered agent and manager for JBW in its Operating Agreement, which said that "all management decisions relating to the LLC's business shall be made by and be the sole responsibility of the Manager."  Wilson was also the only person with trading authority over JBW's account and made all "executive decisions."  This suffices to qualify Wilson as a CPO.

engaged and relied upon the advice of the Professionals."[12]   We
assume that Wilson has not waived the argument that liability for
failure to register requires scienter.[13]

        We agree with the district court that "the registration
requirement does not contain a 'state of mind' limitation to
liability."  Wilson, 19 F. Supp. 3d at 360; cf. CFTC v. British
Am. Commodity Options Corp., 560 F.2d 135, 142 (2d Cir. 1977)
(describing § 6m as a "flat prohibition . . . against using the
facilities of interstate commerce to give commodity advice unless
registered" and concluding that the district court had erred in
requiring "proof of fraud or misconduct" to grant an injunction).
We also note that failure to register under the analogous
Securities and Exchange Commission registration provision, 15
U.S.C. § 80b-3(a), has been held to be subject to strict liability.
See, e.g., Sheldon Co. Profit Sharing Plan & Trust v. Smith, 828
F. Supp. 1262, 1284 (W.D. Mich. 1993) (citing SEC v. Blavin, 557

---

[12]    Wilson also argues that there were "Disputed Material
Facts as to the Founders of JBW Capital," which relate to "Wilson's
control of the JBW entity."  This argument is meritless; Wilson
does not explain how the "Founders'" involvement with JBW is
relevant to whether Wilson, in his capacity as the manager and the
only registered agent of JBW, violated the CFTC's registration
requirement.  See Anderson, 477 U.S. at 247-48.

[13]    Wilson has not helped himself by presenting no serious
argument that violation of the CPO registration requirement
requires scienter.  Indeed, Wilson does not develop this argument,
even in his reply brief, after the CFTC explicitly said that strict
liability should apply and that Wilson had waived any claim to the
contrary.

F. Supp. 1304 (E.D. Mich. 1983), aff'd, 760 F.2d 706 (6th Cir. 1985)).  Because CPO registration is a strict liability offense, Wilson cannot raise a reliance on professionals defense, even granting him the questionable factual assumption that such a defense would be available in his case.  We affirm the district court's decision that Wilson is liable under § 6m(1).

B.   Commodity Fraud

       Wilson was held liable under two commodity fraud provisions: (1) 7 U.S.C. § 6b(a)(1), a general fraud provision, which makes it unlawful "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity," inter alia, to cheat, defraud, willfully make a false report or statement, or willfully deceive or attempt to deceive another person "in regard to any order or contract";[14] and (2) 7 U.S.C. § 6o(1), "a parallel statute forbidding fraud and misrepresentation by commodity trading advisors" and CPOs.  See Stotler & Co. v. CFTC, 855 F.2d 1288, 1291 (7th Cir. 1988).  Under § 6o(1), it is unlawful for a CPO, inter alia, to "employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant" or "engage in any transaction, practice, or course of business which operates as a

---

[14]    Prior to June 18, 2008, these provisions fell under 7 U.S.C. § 6b(a)(i)-(iv).  See CFTC Reauthorization Act of 2008, Pub. L. No. 110-246, § 13102, 122 Stat. 2189, 2194-95 (2008).  We refer to the current version of 7 U.S.C. § 6b.

fraud or deceit upon any client or participant or prospective client or participant." 7 U.S.C. § 6o(1)(A)-(B).

### 1. 7 U.S.C. § 6b(a)

Liability attaches under 7 U.S.C. § 6b(a) when there is "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." CFTC v. Hunter Wise Commodities, LLC, 749 F.3d 967, 981 (11th Cir. 2014) (quoting CFTC v. R.J. Fitzgerald & Co., 310 F.3d 1321, 1328 (11th Cir. 2002)). Wilson does not dispute the elements required to prove a violation of § 6b(a).

Wilson does raise numerous issues with the district court's determination that based on the undisputed facts, Wilson violated this anti-fraud provision. These claims are meritless.

Wilson clearly made numerous false and misleading statements and reports, including those in his e-mails to investors about "Today's NAV," those about his recovery plan, and those in his communications to Mann about Mann's investment. Indeed, Wilson acknowledges that "[t]he evidence showed that Wilson sent certain emails to Investors, which were incomplete or inaccurate in several respects."[15]

---

[15]    Later in his brief, Wilson appears to abandon this position and contend -- without identifying any record evidence to support his assertion -- that "the CFTC has failed to submit any material, undisputed evidence of a misrepresentation in value in Wilson's periodic emails. The record of this case demonstrates that Mr. Wilson did not misrepresent the value of JBW Capital in

As to scienter, Wilson argues that the record does not show "knowing misconduct or severe recklessness," and so does not support a finding of scienter. Our circuit has held that liability under § 6b can be found based on recklessness. See First Commodity Corp. of Boston v. CFTC, 676 F.2d 1, 4, 6-7 (1st Cir. 1982) (explaining that § 6b has a "specific willfulness, or 'scienter' requirement," id. at 4, and that "willful" behavior includes "reckless" actions in the commodities fraud context, id. at 6-7). "A 'reckless' misrepresentation is one that departs so far from the standards of ordinary care that it is very difficult to believe the speaker was not aware of what he was doing." Id. at 6-7. There is ample evidence in the record for us to determine that Wilson acted recklessly, without reaching whether he did so knowingly.[16]

---

his periodic emails, and reported an accurate valuation of a fluidly priced security to a marked-to-market value." We agree with the CFTC that the "fluidly priced security" argument is meritless, as Wilson had daily statements with JBW's value. Further, the evidence in the record demonstrates that Wilson made other false or misleading statements to investors, including an e-mail on September 13, 2008, not informing investors about the losses suffered two days earlier -- a fact that Wilson acknowledged he did not tell investors, and made a number of inaccurate statements to Mann, including one in which Wilson acknowledged he gave Mann a "fictitious" number.

[16]   Parts of the record suggest that some of Wilson's false statements to investors were a result of his "addiction." Wilson makes no argument in his brief suggesting his "addiction" should serve as a defense to scienter, and any such argument would be meritless.

For example, Wilson testified that the September 13, 2008, e-mail stating that "Today's NAV" was $2,475,941 was an intentional statement and admitted that the e-mail was "[a]bsolutely not" accurate when it was sent out.  He also characterized the amount provided as "Today's NAV" in the May 30, 2008, e-mail as an "estimate" even though the word "estimate" did not appear anywhere in the e-mail.  Further, Wilson admitted that when he told Mann what percentage Mann's investment was of the fund in 2008, he gave Mann "a fictitious number" -- "it was basically $100,000 of two and a half million."  He admitted he did not tell Mann that there was in fact not $2 million in the fund because of "[f]ear, simple as that" and a concern that Mann would not invest the money if he learned the truth.  Further, Wilson acknowledged that he needed Mann's money to help regain the losses JBW had suffered.  Wilson admitted that when he received funds from Mann and told Mann that he would deposit the funds in the next few days, he did not tell him about the losses that JBW suffered in the preceding days.  Wilson said that he "incorrectly based" Mann's beneficial interest in the company as stated in the Certificate of Beneficial Interest "on the high watermark of the fund . . . [b]ecause [his] intent all along was to recover the entire fund back to the 2.3 or $4 million that [he] consider[ed] the high watermark . . . .  It was a grievous error on [his] part showing the power of [his] addiction."

Wilson protests that he must have lacked scienter because "if [he] had intended to act fraudulently, he would have liquidated his own position in JBW long before . . . September 2008." This argument fails. Wilson could have acted recklessly, whether or not intentionally, with regard to false or misleading statements, even as his money remained in the fund. Indeed, his own testimony explains that he made the misrepresentations in order to attract and retain investors. Wilson admitted that he did not tell Mann about the losses incurred because of "fear" Mann would not invest in the fund otherwise. Wilson's e-mail to investors explaining why he failed to inform them of the September 11, 2008, loss revealed a similar motivation of not wanting to scare investors. He wrote that his "intention was not to deceive but to 'roll' the loss into the next week and hopefully show some recovery. Clearly, a recovery was not the case . . . ." Whether or not Wilson's "intention" was "to deceive" investors, he knowingly sent an e-mail that he admitted understated JBW's actual value on September 13, 2008.[17]

The cases that Wilson relies on from the securities context to support his claim that he lacked scienter because his

---

[17]   To the extent Wilson is arguing that he relied on professionals to comply with "regulatory and compliance requirements," this claim fails, as he points to nothing in the record suggesting he consulted with anyone before making the inaccurate statements at issue.

money remained in the fund do not apply here.  In In re Worlds of
Wonder Securities Litigation, the Ninth Circuit affirmed the
district court's grant of summary judgment to the defendants with
regard to the plaintiffs' claims under § 10(b) and Rule 10b-5 of
the 1934 Securities Exchange Act.  35 F.3d 1407, 1424-28 (9th Cir.
1994).  With regard to one group of defendants, the company's
officers, the court found that "[t]he plaintiffs produced no direct
evidence of any scienter on the part of the [officer defendants]"
and instead sought to "rely on speculative inferences that arise
from the [officer defendants'] allegedly suspicious conduct."  Id.
at 1425.  There, the court found that "[t]he detailed risk
disclosure in the . . . [p]rospectus negates an inference of
scienter."  Id.  With regard to another group of defendants, the
directors and major shareholders, the court noted that it was faced
with "mere speculation and conclusory allegations."  Id. at 1427
(quoting In re Worlds of Wonder Sec. Litig., 814 F. Supp. 850, 871
(N.D. Cal. 1993)).  It then found that under the facts of that
case, "[e]ven if the evidence was sufficient to permit an inference
that one or more of the defendants had access to inside
information, the defendants' actual trading would conclusively
rebut an inference of scienter."  Id.  As to the directors and
major shareholders, there was no evidence that any of the
defendants intentionally or recklessly engaged in fraudulent
conduct, only that the defendants had access to "undisclosed

adverse, material information" when they sold the company's securities. Id. Here, however, Wilson's own statements viewed most favorably to him provide direct evidence not only that he had accurate information about JBW's performance but also that he intentionally or recklessly withheld that information from investors, in at least one instance out of fear of losing a potential investor. And so, the fact he kept his funds in JBW cannot rebut a finding of scienter here.

As to materiality, there is no doubt that the misrepresentations were material. A statement or omission is material "if there is a substantial likelihood that a reasonable [investor] would consider it important" in making an investment decision. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). Here, it is clear that there was a substantial likelihood that a reasonable investor would have considered information about "Today's NAV," the value of the fund on the market, and the recovery plan as important to his or her investing decisions. See Bruhl v. Price Waterhousecoopers Int'l, 257 F.R.D. 684, 697 (S.D. Fla. 2008) ("The fact that a hedge fund investor would consider factors other than the NAV statements, or the fact that some investors would have access to different data, does not eliminate the NAV statements as a relevant and material matter to be considered in the investment calculus."); SEC v. Princeton Econ. Int'l Ltd., 73 F. Supp. 2d 420, 424 (S.D.N.Y. 1999); cf. R.J.

Fitzgerald & Co., 310 F.3d at 1332 ("Given the extremely rosy picture for profit potential painted . . . , a reasonable investor surely would want to know -- before committing money to a broker -- that 95% or more of RJFCO investors lost money.").

Wilson suggests that the inaccurate statements were immaterial because "the evidence is undisputed that no Member of JBW Capital sought to buy or sell his or her membership interests in JBW, or attempt[ed] to buy or sell such JBW membership interest, in reliance of such emails and in contravention to the provisions of the Operating Agreement," and "[t]he evidence submitted by the CFTC demonstrated that none of the Investors pulled their funds in September 2008." Similarly, Wilson argues that "[t]he evidence showed that not only were these events disclosed to Mann, but that he continued to hold his investment for months after disclosure, thereby ratifying the transactions."

However, reliance is not an element required to prove a violation of § 6b(1). See Slusser v. CFTC, 210 F.3d 783, 786 (7th Cir. 2000) (suggesting that the actions proscribed by § 6b(a) "may be condemned . . . without proof of reliance"). Wilson's arguments therefore miss the mark because they do not address whether his misrepresentations were material but instead discuss whether investors actually acted on material information or omissions.

Finally, Wilson asserts that the district court erred in granting summary judgment on the commodity fraud provisions "due

to the absence of material, undisputed evidence that demonstrated any misrepresentation of the Appellants was 'in connection with' any order to [m]ake, or making, a future contract." See 7 U.S.C. § 6b(a)(1). He contends that "there [were] no transactions which were 'in connection with'" the September 2008 e-mails. This claim fails as well. Wilson concedes that "[a]ctionable misrepresentations include those made to persons when soliciting funds." See Saxe v. E.F. Hutton & Co., 789 F.2d 105, 110-11 (2d Cir. 1986); Hirk v. Agri-Research Council, Inc., 561 F.2d 96, 103-04 (7th Cir. 1977). And Wilson admitted that he made false representations to Mann out of "fear, simple as that" that Mann would not invest his money otherwise, and that he needed Mann's money to regain losses JBW incurred. This statement alone would be sufficient to find a violation of § 6b(a), as it was "in connection with . . . the making of, [a] contract of sale of [a] commodity." 7 U.S.C. § 6b(a)(1). How many misrepresentations there were does not change our affirmance, as Wilson does not sufficiently raise a challenge to the amount of civil monetary penalties imposed.[18] See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

---

[18] Wilson does argue that the district court erred by denying his "request for an evidentiary hearing as to relief, including civil penalties and injunctive relief." However, Wilson does not explain what an evidentiary hearing would provide on a motion for summary judgment that could not be introduced through stipulations or other written submissions.

Further, other circuits' case law makes clear that "[t]he plain meaning of [§ 6b's] broad language cannot be ignored." Hirk, 561 F.2d at 104 (explaining that "[b]y its terms, Section [6b] is not restricted in its applications to instances of fraud or deceit 'in' orders to make or the making of contracts," id. at 103-04, but also "encompasses conduct 'in or in connection with' futures transactions," id. at 104); see R&W Tech. Servs. Ltd. v. CFTC, 205 F.3d 165, 173 (5th Cir. 2000) (examining the legislative history of § 6b and concluding that the provision should be construed "broadly rather than narrowly").

Wilson's knowingly or recklessly issuing "account statements that fraudulently misrepresented the NAV" of pool participants' investments also violated § 6b(a). See CFTC v. Arjent Capital Mkts. LLC, No. 12-CV-1832, 2013 WL 3242648, at *5 (S.D.N.Y. Mar. 19, 2013); see also CFTC v. PMC Strategy, LLC, 903 F. Supp. 2d 368, 377 (W.D.N.C. 2012) ("Delivering, or causing the delivery of, false account statements to pool participants constitutes a violation of the [Commodity Exchange] Act . . . ."); cf. Princeton Econ. Int'l Ltd., 73 F. Supp. 2d at 422-24 (finding that letters overstating the accounts' NAV "certainly were in connection with later 'sales'").[19]

---

[19]    As for Wilson's remaining contentions -- ranging from claims that accountant Lillian Gonzalez's testimony provides material facts in dispute to claims that Mann's testimony creates material facts in dispute -- these do not raise genuine issues of

    2.   7 U.S.C. § 6o(1)

    Under § 6o(1), it is unlawful, inter alia, for a CPO
"(A) to employ any device, scheme, or artifice to defraud any
client or participant or prospective client or participant; or (B)
to engage in any transaction, practice, or course of business which
operates as a fraud or deceit upon any client or participant or
prospective client or participant."  7 U.S.C. § 6o(1)(A)-(B).
Wilson agrees that § 6o(1) "is a comparable provision [to § 6b(a)]
regarding fraud and misrepresentations only by CPOs and [commodity

───────────────

material fact relevant to whether Wilson violated the commodity
fraud provisions.  See Anderson, 477 U.S. at 247-48.  For example,
Mann's background as an experienced investor who conducted due
diligence on JBW prior to investing does not change our analysis
of whether Wilson made materially false or misleading statements
with scienter.  "[T]he substantive law will identify which facts
are material.  Only disputes over facts that might affect the
outcome of the suit under the governing law will properly preclude
the entry of summary judgment.  Factual disputes that are
irrelevant or unnecessary will not be counted."  Id. at 248.
    To the extent Wilson is asserting an affirmative defense
of "ratification," this claim fails as well.  As an initial matter,
other than one Delaware Chancery Court opinion from 1930, Wilson
provides no support for his argument that ratification applies as
a defense in CFTC enforcement actions.  Either way, his argument
fails on the merits, as other than one e-mail in September 2008
-- which did not even disclose the full amount of the losses --
and the oblique reference in his brief to "disclosures to Mr. Mann
in January and February of 2009," Wilson points to no evidence in
the record appendix that demonstrates that he indeed disclosed the
extent of his misrepresentations to investors.
    Wilson's argument that "the District Court erred in that
the Investors of JBW Capital have waived their right to rescission
due to the failure to bring a claim within the statute of
limitations" for tort-based claims in Massachusetts is irrelevant
to the CFTC's action under the CEA.

trading advisors]."  The major differences between § 6b(a) and § 6o include (1) that § 6o(1) requires "use of the mails or any means or instrumentality of interstate commerce"; and (2) § 6o(1) applies specifically to commodity trading advisors and CPOs.  See Princeton Econ. Int'l Ltd., 73 F. Supp. 2d at 424.[20]

Wilson was a CPO.  He has admitted to using the telephone and e-mails as an officer of JBW.  That ends the matter.  Cf. Stotler & Co., 855 F.2d at 1291 (explaining that § 6o "is a parallel statute [to § 6b] forbidding fraud and misrepresentation by commodity trading advisors").

IV.

We review "a district court's decision to grant or withhold an equitable remedy . . . for abuse of discretion."  State St. Bank & Trust Co. v. Denman Tire Corp., 240 F.3d 83, 88 (1st

_____

[20]   Wilson challenges the district court's statement that § 6o(1)(B) does not require proof of scienter.  Our circuit has stated that § 6o "does not depend on scienter," and that the "provision outlaws conduct that merely 'operates' as a fraud, and thus suggests that scienter is not the sine qua non of all statutory liability for 'fraud.'"  First Commodity Corp. of Boston, 676 F.2d at 6; see also Messer v. E.F. Hutton & Co., 847 F.2d 673, 679 (11th Cir. 1988) (per curiam) (noting that the language of § 6o(1)(B) tracks Securities Act of 1933 § 17(a)(3) and Investment Advisers Act § 206(2), "which have been interpreted as not requiring proof of scienter" and finding "no reason to distinguish the interpretations of these analogous statutory provisions from the interpretation of Section 6o(1)(B)").  We need not address Wilson's argument here further because, as discussed above, we find that the facts taken most favorably to Wilson demonstrate he had scienter with regard to a number of the misrepresentations.

Cir. 2001). Under 7 U.S.C. § 13a-1(d)(3), the court may impose equitable remedies including restitution and disgorgement. 7 U.S.C. § 13a-1(d)(3).

To be clear, restitution, as the CFTC seeks it, includes total losses suffered by the victims. Disgorgement is limited to "the amount with interest by which the defendant profited from his wrongdoing." SEC v. MacDonald, 699 F.2d 47, 54 (1st Cir. 1983) (en banc) (quoting SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978)). While some of the language used by the district court appears not to recognize the distinction,[21] in the end we believe its decision not to award restitution to the victims rested on different grounds. The court did not, as the CFTC asserts, hold it lacked authority to order restitution, but rather explained that it was not compelled to order restitution in light of the CFTC's presentation.

In its memorandum and order on the CFTC's motion for summary judgment, the district court stated, "[i]n the absence of a showing by the CFTC of any personal gain on Wilson's part as the result of the fraud, the appropriate measure of a civil penalty is the statutory per-violation amount." Wilson, 19 F. Supp. 3d at 364. In a footnote, it said that the CFTC requested disgorgement and restitution, and that "the court's jurisdiction under [7 U.S.C.

---

[21]    We urge the district court to more clearly define these concepts in the future.

§] 13a-1 includes equitable remedies such as disgorgement and restitution." Id. at 364 n.16. It then went on to quote FTC v. Verity Int'l Ltd., 443 F.3d 48 (2d Cir. 2006), and say, "the appropriate measure for restitution here is 'the benefit unjustly received by the defendants.'" Wilson, 19 F. Supp. 3d at 364 n.16 (quoting Verity, 443 F.3d at 67). The district court explained that "no evidence has been presented with regard to the amount of retained profits or ill-gotten gains. The court therefore declines to enter an order of restitution." Id.

The CFTC filed a motion for partial reconsideration of the judgment with respect to restitution, arguing that the district court erred as a matter of law by relying on Verity, a case that our circuit has explained represents "an exception limited to the situation 'when some middleman not party to the lawsuit takes some of the consumer's money before it reaches a defendant's hands.'" FTC v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 14 (1st Cir. 2010) (quoting Verity, 443 F.3d at 68). In its memorandum and order on the CFTC's motion for partial reconsideration, the district court stated that this "First Circuit precedent essentially affirm[s] the discretion of a district court to fashion a remedy tailored to the facts of a given case." Wilson, 19 F. Supp. 3d at 365. The district court explained that it "was not persuaded by the CFTC's argument that restitution should be awarded," and quoting Trabal Hernandez v. Sealand Servs. Inc., 230 F. Supp. 2d 258, 260 (D.

P.R. 2002), referred to its disagreement with the CFTC as "a difference of opinion." Id. at 366.

On appeal, the CFTC maintains that the district court erred as a matter of law and so abused its discretion by concluding restitution was unavailable. We disagree. Our reading of the district court's decision is that it viewed its decision not to award restitution as an exercise of discretion -- not that it lacked authority to do so. In Direct Marketing, we explained in the context of deceptive advertising that "the law allows for broad discretion in fashioning a remedy." 624 F.3d at 14. And that is what the district court did. It explained that under the facts of this case, where the CFTC presented "no evidence . . . with regard to the amount of retained profits or ill-gotten gains," it "declines to enter an order of restitution." Wilson, 19 F. Supp. 3d at 364 n.16. Indeed, the district court clarified that its decision was a matter of discretion when, in its decision on the CFTC's motion for reconsideration, it explained that Direct Marketing "essentially affirm[s] the discretion of a district court to fashion a remedy tailored to the facts of a given case." Id. at 365.

The CFTC has argued to us that the error was one of law, an argument we have rejected. It has otherwise not argued on the facts how this choice not to order restitution was an abuse of discretion, other than saying other courts have chosen to grant

- 29 -

restitution in similar circumstances.  In the absence of such an argument, we cannot say there was an abuse of this discretion.

We _affirm_ the district court's grant of summary judgment and the relief it ordered.